# COURT OF APPEALS OF VIRGINIA

## Record No. 1092-25-4

CRISTINA SANCHEZ LANDON
v.
COMMONWEALTH OF VIRGINIA

Present: Judges O'Brien, Causey and Bernhard
Argued at Fairfax, Virginia

Opinion Issued August 4, 2026[*]

### FROM THE CIRCUIT COURT OF SHENANDOAH COUNTY
Kevin C. Black, Judge

David L. Hensley (Gunter Hensley, P.C., on briefs), for appellant.

Matthew J. Beyrau, Senior Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

### MEMORANDUM OPINION BY
### JUDGE MARY GRACE O'BRIEN

Cristina Sanchez Landon (appellant) was convicted of first-degree murder of 72-year-old Patricia "Patty" Walker (Patty) and sentenced to life in prison. She argues that the circuit court erred in refusing her proposed jury instruction on lack of motive, giving a jury instruction regarding the use of a deadly weapon, and finding sufficient evidence to support the jury's verdict. Finding no error, we affirm.

## BACKGROUND

Bernard "Donnie" Walker (Donnie), who was in his early 90's, and Patty (collectively, the Walkers) had married, divorced, and reunited later in life. In 2021, they moved into a duplex in

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

Strasburg, Virginia. Donnie had previously lived with his daughter, Tammy, and her wife, appellant, in Florida, where Donnie and appellant formed a close relationship—she called him "dad."

On July 3, 2023, Donnie and Patty ate lunch together and laid down for a nap in their separate bedrooms. When Donnie woke up around 4:00 p.m., he went to water the plants in the backyard, which took him about an hour. He did not lock the front door behind him when he went outside—the house only had one entrance. After he came back inside, he went to bed again. Later, when Donnie got up to get some water, he discovered Patty "laying on her stomach" in the kitchen, with "blood coming out of her head." Donnie immediately called 911 and stated that Patty had fallen and hit her head and that she felt cold. He explained that he had been outside watering the plants around 4:00 p.m. and that she had been "alright then." At trial, he clarified that he did not actually remember seeing Patty around 4:00 p.m.

On that day, neighbors' security cameras recorded appellant's car driving toward the Walkers' house at 4:04 p.m. and driving away again at 4:07 p.m. Those cameras also captured appellant walking toward the house at 4:09 p.m. with her backpack on. Sixteen minutes later, appellant walked in the other direction, away from Patty and Donnie's house, this time holding her backpack in her hand.

The Walkers' neighbor, who lived in the other half of the duplex, was working from home on July 3, when she heard a noise "through [her] living room wall" between 3:45 and 4:30 p.m. "It sounded like a crash of some sort[,] . . . like something was falling." A little while later, she heard "something moving." She had never heard any similar noises coming from the Walkers' home.

Josh Sherman, an EMT firefighter, and his partner were dispatched to Strasburg "for a fall." Donnie was waiting for them at the front door and led them into the kitchen, where Patty was lying "on her stomach with a pool of blood around her head." The blood had "started to coagulate . . .

around the outer portions of the pooling." When the EMT firefighters turned Patty over, they discovered "a huge laceration on her throat" and called law enforcement. They took Donnie to the ambulance to make sure he was unharmed, but they did not notice any injuries or blood on him.

Officer Christopher Nixon from the Strasburg Police Department (SPD) arrived at the Walker residence and secured the crime scene. He also checked the flower beds in the backyard, which "felt wet to the touch," even though it had not rained that day. While securing the house, he did not see any wet or bloody clothes.

When Detective Aaron Springer arrived, he observed that the house was very clean and well kept. He immediately noticed that some furniture and pictures seemed "crooked" in one area of the living room. Detective Springer found two wet, red-stained towels on the floor near a "crooked" recliner. He also found several red stains on a post-it note, a calendar on the floor, a doily, a few places on the carpet, as well as on the wall toward the entrance of the kitchen. He testified that all the stains were "consistent with being blood."

Detective Springer saw that the kitchen sink was wet and a sponge inside it also "appeared to still be wet." A bottle of detergent was lying in the sink, and the "hand soap . . . was knocked over." Detective Springer found "a knife wrapped in a paper[ ]towel" in "a cabinet below the sink to the right." He noticed the knife because "[i]t looked very out of place." In that same cabinet, he discovered "a second knife that was at the bottom of the cabinet . . . stuffed into the side." The paper towels wrapped around the first knife were dry, but the pattern did not match the pattern of the paper towel roll he found in the kitchen—it had a different design. Detective Springer later found two baskets in the bathroom that held paper towels whose pattern matched the pattern on the paper towels wrapped around the knife.

SPD Lieutenant Cody Meade interviewed Donnie on July 5. During that interview, Donnie stated that he had last seen Patty alive at 1:30 p.m. on July 3.

- 3 -

Lieutenant Meade also spoke with appellant on the phone. Appellant told him that she had not been in Virginia the past week and that she had "never met" Patty. Lieutenant Meade later interviewed her in person. During that interview, appellant called Patty a "control freak" and referred to her committing "elder abuse." She said that Patty would not allow her to join Patty, Donnie, and Tammy for lunch because Tammy and appellant were gay. According to appellant, Patty did not allow Donnie to have any contact with them. She also accused Patty of having "finagled" Donnie to buy the duplex and a car, which he later put in Patty's name. Finally, appellant admitted that she drove past "dad's house" on the day of Patty's death.

At trial, Eileen Green, Patty's daughter, testified that Tammy and appellant had visited her in Woodbridge, Virginia, the week before Patty's death. During their visit, appellant asked Green if she was "good with Donnie dying and you never seeing him again." Green was talking to Donnie "[o]ff and on," but last spoke to him when he moved to Virginia from Florida, before Patty took his phone away. Green also testified that she spoke to appellant after Patty's death and that appellant seemed emotional.

Appellant's sister, Michelle Lawrence, who lived in Maryland, testified that she got an unexpected call from appellant on July 6, in which appellant told her she had come to visit. When Lawrence came home from work, appellant was in the driveway, cleaning her car with something that smelled like bleach. Appellant said she had "spilled some cocoa."

Dr. Gene Maya, the medical examiner, testified at trial that Patty had several bruises on her upper back, shoulders, and face, all of which occurred "at or around the time of death." Dr. Maya explained that Patty had suffered "at least three[,] probably more, overlapping incised wounds or cuts" to the front of her neck, caused by "[a] sharp object so, something with a sharp edge." Those cuts were deep enough to sever her trachea and carotid artery. During the autopsy, Dr. Maya also discovered that Patty's neck had recently been broken. That injury resulted from

"hyper flexion" of the neck, which could be caused by pulling up a person's head from behind while the person was "laying face down on the floor."

Kelly Loynes, a forensic scientist, confirmed that the "red stains" that were found in the Walker residence were Patty's blood. She also examined DNA that Dr. Maya had recovered from under Patty's fingernails during the autopsy and determined that the DNA belonged to appellant.

The jury found appellant guilty of first-degree murder. The court denied appellant's motion to set aside the verdict, and sentenced appellant to life in prison.

ANALYSIS

I. Absence of Motive Instruction

Appellant "maintains that there was no evidence" of a motive. She argues it was, therefore, "prejudicial error to refuse her 'absence of motive' instruction." Appellant's proposed Jury Instruction "M" stated that "[t]he absence of all evidence of an inducing cause or motive to commit murder, when the fact is in reasonable doubt as to who committed it, affords a strong presumption of innocence." Appellant also contends that this was a "counter instruction" to Jury Instruction 13, which the court gave. Jury Instruction 13 provided that the jury may consider the "presence or absence of motive" in determining guilt and that the Commonwealth did not have to prove a motive.

"This Court reviews the trial court's decisions in giving or denying jury instructions under an abuse of discretion standard." *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019). "In deciding whether an instruction was appropriate, the appellate court views the facts in the light most favorable to the instruction's proponent." *Howsare v. Commonwealth*, 293 Va. 439, 443 (2017).

When reviewing jury instructions on appeal, "this Court's 'sole responsibility . . . is to see that the law has been clearly stated and that the instructions cover all the issues which the evidence fairly raises.'" *Jones v. Commonwealth*, 71 Va. App. 70, 93 (2019) (alteration in original) (quoting *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009)). "[E]ven if jury instructions contain accurate statements of law, a trial court does not abuse its discretion by refusing the instruction if it 'is not applicable to the facts and circumstances of the case,' or if it 'would have created confusion and would have been misleading.'" *Id.* at 93-94 (alteration in original) (quoting *Juniper v. Commonwealth*, 271 Va. 362, 431 (2006)).

Appellant relies on *Vaughan v. Commonwealth*, 85 Va. 671, 673 (1889), where the Virginia Supreme Court found that a trial court erred in refusing to give a jury instruction that stated that "where there is an entire absence" of evidence regarding motive, there is "a strong presumption of innocence." But the Court later clarified that when some evidence of motive is before the jury, the trial court properly refused an "absence of motive" instruction, reasoning that "[t]he court, as a rule, ought not to emphasize evidence tending to prove particular facts in the case . . . nor to stress the lack of evidence as to a particular fact." *Belote v. Commonwealth*, 135 Va. 468, 471 (1923) (citations omitted).

The Supreme Court reiterated its holding in two other cases in which it found no error in refusing the "absence of motive" instruction when there was evidence of a possible motive because the effect of that instruction "was . . . to tell the jury there was no evidence whatsoever of motive." *Peoples v. Commonwealth*, 147 Va. 692, 707 (1927); *see also Oliver v. Commonwealth*, 151 Va. 533, 544 (1928) (emphasizing that "[t]he motive shown may have been slight, and it may have been ample[, but] . . . [i]t cannot be said 'there was no evidence whatsoever of motive'" (quoting *Peoples*, 147 Va. at 707)).

Similarly, here, we cannot say that "there was no evidence whatsoever of motive." *Peoples*, 147 Va. at 707. Appellant told Lieutenant Meade that Patty was a "control freak," who controlled Donnie, which appellant called "elder abuse." Appellant also said that Patty did not allow her to join Donnie and Tammy for lunch because appellant and Tammy were gay. She further accused Patty of having "finagled" Donnie to buy a house and car and then later transfer it to Patty's name. Green testified that appellant spoke to her about Patty and Donnie's relationship and asked her if she was "good with Donnie dying and you never seeing him again."

A jury could have heard those statements and concluded that appellant did have a motive for killing Patty. *See Belote*, 135 Va. at 471 ("Whether there was an absence of all evidence of an inducing cause or motive was a question for the jury."). Giving the "absence of motive" instruction could have been misleading to the jury, "in effect, [telling] the jury there was no evidence whatsoever of motive." *Peoples*, 147 Va. at 707.

Further, appellant cites no authority for her contention that her proposed "absence of motive" instruction should have been given as a "counter instruction." She merely states that she "should have been permitted to instruct the jury" on the presumption of innocence based on lack of motive when the Commonwealth "was permitted to instruct the jury that it does not have to prove a motive." But "a court may exercise its discretion and properly exclude an instruction that both correctly states the law and is supported by the evidence when other granted instructions fully and fairly cover the relevant principle of law." *Watson v. Commonwealth*, 298 Va. 197, 207 (2019) (quoting *Payne v. Commonwealth*, 292 Va. 855, 869 (2016)). Here, the given instruction told the jury that they were allowed to consider "[t]he presence or absence of motive" in their determination of guilt. Thus, the "granted instructions fully and fairly cover[ed] the relevant principle of law," *Watson*, 298 Va. at 207 (quoting *Payne*, 292 Va. at 869), and any

- 7 -

"counter instruction" is therefore unnecessary. The court thus did not err in refusing appellant's jury instruction.

## II. Deadly Weapon Instruction

Appellant argues that the court erred in instructing the jury that it could infer malice from the use of a deadly weapon because "no murder weapon was recovered in this case." Although appellant concedes that a knife was found under the kitchen sink that could have caused Patty's injuries, she argues that "no DNA or fingerprints were found" on that knife and there was no evidence linking her to the knife.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except . . . to enable this Court to attain the ends of justice." Rule 5A:18. "The purpose of Rule 5A:18 is to 'enable the ruling court to take any necessary corrective action,' and to 'rule intelligently on the issues presented.'" *Cox v. Commonwealth*, 65 Va. App. 506, 515 (2015) (citations omitted) (quoting *Johnson v. Commonwealth*, 58 Va. App. 303, 314 n.2 (2011)). "Consistent with this purpose, we have held that objections must be stated with specificity . . . and that a general objection made 'for the record' is insufficient." *Cortez-Hernandez v. Commonwealth*, 58 Va. App. 66, 80 n.7 (2011) (alteration in original) (quoting *Hogan v. Commonwealth*, 5 Va. App. 36, 45 (1987)).

Here, appellant did not state her objection with the required specificity but merely requested that the court "simply for the purposes of the record note our objection" to the deadly weapons instruction. That objection is insufficient to preserve the issue on appeal.

In her reply brief, appellant requests for the first time that, if this Court finds the issue was not sufficiently preserved, we apply the ends-of-justice exception. But Rule 5A:20 requires "that a request to apply a Rule 5A:18 exception 'must' be made in the appellant's opening brief." *House v. Commonwealth*, 87 Va. App. 638, 659 (2026) (quoting Rule 5A:20); *see Stokes v.*

*Commonwealth*, 61 Va. App. 388, 397 (2013) (refusing to apply the ends-of-justice exception when raised for the first time at oral argument); *Jeter v. Commonwealth*, 44 Va. App. 733, 740 (2005) (noting that the purpose of Rule 5A:20 is to give "notice of the authorities upon which the appellant purports to rely" and that "appellee therefore has no meaningful opportunity to address arguments and authorities raised for the first time in a reply brief"). Thus, appellant's second assignment of error is waived.

### III. Sufficiency of the Evidence

Appellant argues that the evidence supporting the jury's verdict was insufficient because the Commonwealth presented no direct evidence that she killed Patty. She contends that Donnie's 911 call was inconsistent with his statement to Lieutenant Meade. Appellant also alleges that no murder weapon was recovered. She further posits that the forensic expert did not specify whether the DNA found under Patty's fingernails was blood, saliva, skin, or some other material. Finally, appellant again argues that there was no evidence of a motive.

"When reviewing the sufficiency of the evidence to support a conviction, the Court will affirm the judgment unless the judgment is plainly wrong or without evidence to support it." *Brown v. Commonwealth*, 74 Va. App. 721, 729-30 (2022) (quoting *Bolden v. Commonwealth*, 275 Va. 144, 148 (2008)). "When considering a challenge to the sufficiency of the evidence, this Court reviews the evidence in the light most favorable to the Commonwealth, 'as the prevailing party in the trial court.'" *Kelley v. Commonwealth*, 69 Va. App. 617, 624 (2019) (quoting *Hamilton v. Commonwealth*, 279 Va. 94, 103 (2010)).

"In reviewing a challenge to the sufficiency of the evidence to support a conviction, 'the relevant question is whether . . . any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Melick v. Commonwealth*, 69 Va. App. 122, 144 (2018) (quoting *Kelly v. Commonwealth*, 41 Va. App. 250, 257 (2003) (en banc)). "In conducting our

analysis, we are mindful that 'determining the credibility of the witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact, who has the ability to hear and see them as they testify.'" *Raspberry v. Commonwealth*, 71 Va. App. 19, 29 (2019) (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015)). "The pertinent question in this appeal is whether a rational factfinder, in light of all the evidence, could have rejected [the defendant's] theories of innocence and found him guilty beyond a reasonable doubt." *Walker v. Commonwealth*, 79 Va. App. 737, 748 (2024) (alteration in original) (quoting *Commonwealth v. Moseley*, 293 Va. 455, 464 (2017)).

Appellant argues that the evidence was insufficient because there was no direct evidence that she committed the crime. But "[c]ircumstantial evidence is competent and is entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Smith v. Commonwealth*, 85 Va. App. 435, 456 (2025) (quoting *Kelley*, 69 Va. App. at 629). And "[i]dentity may be established entirely by circumstantial evidence." *Hughes v. Commonwealth*, 87 Va. App. 136, 148 (2026).

Here, sufficient evidence supported the jury's conclusion that appellant killed Patty. On July 3, Donnie called 911 at 5:41 p.m., stating that Patty had fallen and felt cold. He explained that he had come into the house after watering the plants around 4:00 p.m. and that "she was alright then." During an interview with Lieutenant Meade, Donnie said that he last saw Patty at 1:30 p.m. Appellant contends that this was an "inconsistency," presumably implying that Donnie is not credible. But determining credibility and the truth between "conflicting" testimonies are issues to be resolved by the jury. *See Pavlick v. Commonwealth*, 27 Va. App. 219, 228-29 (1998).

Further, on July 3, neighbors' security cameras recorded appellant's car driving toward Patty's house at 4:04 p.m. and away again at 4:07 p.m. In her police interview, appellant admitted driving past "dad's house" that day. Two minutes later, at 4:09 p.m., appellant walked toward the

Walkers' house wearing her backpack, which was also captured by two neighbors' security cameras. Sixteen minutes later, those cameras filmed appellant walking in the other direction, away from the house, this time holding her backpack in her hand.

Between 3:45 and 4:30 p.m., a neighbor living in the other half of Donnie and Patty's duplex heard some noises through the living room wall that "sounded like a crash of some sort[,] . . . like something was falling." A little while later, she heard "something moving." She had never heard noises like that coming from the Walkers' residence.

A forensic expert testified that she found appellant's DNA under Patty's fingernails. And the medical examiner testified that Patty had suffered several bruises on her face, upper back, and shoulders. The jury could have concluded that there was a struggle between appellant and Patty. Appellant points out that the forensic expert could not state what type of biological material was found under Patty's fingernails. But appellant fails to argue why that is significant to the sufficiency of the evidence analysis, and she cites no authority to support such an argument. *See Fleming v. Commonwealth*, 85 Va. App. 27, 54 (2025) ("[W]here a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." (quoting *Bartley v. Commonwealth*, 67 Va. App. 740, 746 (2017))).

Further, acknowledging that the Commonwealth does not have to prove motive, appellant again contends that there was no motive. But the evidence was sufficient for the jury to find that appellant had a motive. Similarly, there was sufficient evidence for the jury to reject appellant's argument that there was no murder weapon. Detective Springer found two knives that seemed "out of place" in a kitchen cabinet below the sink—one wrapped in paper towels that came from the bathroom. The medical examiner testified that Patty suffered "at least" three cuts across her neck with a "sharp object," like a knife. This evidence could allow the jury to conclude that one of the knives was, in fact, the murder weapon.

Finally, the jury heard evidence of appellant showing up unexpectedly at her sister's house a few days after Patty's death and that, when her sister came home from work, appellant was in the driveway cleaning her car with something that smelled like bleach.

Accordingly, considering the evidence in the light most favorable to the Commonwealth, *see Kelley*, 69 Va. App. at 624, the court did not err in finding that sufficient evidence supported the jury's verdict.

CONCLUSION

For these reasons, we affirm the circuit court's judgment.

*Affirmed.*